STATE of Missouri, Respondent,

v.

John Michael RILEY, Appellant.

John Michael RILEY, Appellant,

v.

STATE of Missouri, Respondent.

Nos. WD 46762, WD 49073.

Missouri Court of Appeals,
Western District.

April 4, 1995.

As Modified June 22, 1995.

Motion for Rehearing and/or Transfer to Supreme Court Denied June 27, 1995.

Application to Transfer Denied
July 25, 1995.

Craig A. Johnston, Office of the State Public Defender, Columbia, for appellant.

Jeremiah W. (Jay) Nixon, Atty. Gen., Cheryl A. Caponegro, Asst. Atty. Gen., Jefferson City, for respondent.

Before ULRICH, P.J., and KENNEDY and BERREY, JJ.

KENNEDY, Judge.

Defendant was convicted after a jury trial of trafficking drugs in the first degree, § 195.222.7(1), RSMo Supp.1992. He was sentenced to 15 years' imprisonment. He appeals.

Defendant attacks the sufficiency of the evidence to support his conviction of first degree trafficking, and to support the giving of the verdict-directing instruction. We have found that the evidence is sufficient to support both the conviction and the giving of the verdict-directing instruction. We take up the points at which defendant argues that the evidence fell short:

Defendant's first point is that the evidence does not support the verdict. He argues the evidence is insufficient at two points—insufficient to show the necessary weight of 30 kilograms of marijuana (section 195.222.7(1)), and insufficient to show that defendant "manufactured or produced" the marijuana (section 195.222.7).

The evidence favorable to the verdict tends to show the following:

Danny Peach was arrested on September 10, 1991, and was found to be in possession of a quantity of marijuana. Faced with prosecution, Peach told the officers about an ongoing marijuana operation on his farm in Ray County. He told the officers, and later testified at the trial, that a group of men, working at night, collected the marijuana growing wild at various locations and brought it first to Peach's barn. The method of preparing this marijuana was, first, to leave it in plastic trash bags for a couple of days. The heat of the sun would cause the plants to sweat. After a couple of days, the marijuana would be spread out on the floor of Peach's barn loft, where it would dry. As the next step, the "stripping crew" would strip the leaves off the marijuana. They would compress it with a trash compactor, or would compress it by stomping on it in a tool box. They would spray the resulting product with orange extract to mask the odor.

With Peach's consent, the officers searched the barn and Peach's residence on September 11. They found marijuana in small quantities, and found paraphernalia that bore out Peach's story about the marijuana operation. When they returned on September 12, there were several black trash bags full of marijuana in the upper tier of the large barn, and there was a quantity of marijuana scattered in the barn. This marijuana had not been there on the preceding day, September 11.

Peach, in collaboration with the officers, made telephone calls to Orville Childress, who seemed to be in charge of the operation. Some of these telephone calls were recorded by the officers, and one telephone conversation between Peach and Childress was listened to by one of the officers on an extension phone. This conversation occurred on September 14. In this conversation, Peach asked Orville Childress if he was coming to the farm. Orville said that Mike and Tony were already on the way ("Mike" was defendant Riley) in a 1969 Chevrolet pickup truck. He told Peach he wanted them to take care of "it" the same way they usually did, and not to use lights at night.

On September 14, defendant and Tony Childress drove on to the Peach property in a blue and gray Chevrolet pickup truck. Defendant was driving. They stopped at the house. They honked the horn on the truck, and one of the occupants got out and went to the door. He then turned around and reentered the truck. The truck proceeded to the rear of the barn. The time was approximately 1:00 o'clock p.m.

The officers, who were lying in wait in the barn, emerged and arrested defendant and Tony Childress.

■ The marijuana collected by the officers and in the Peach residence, and in the barn on the two occasions totalled more than 30 kilograms (actually, 30,287.12 grams, or 30.28712 kilograms). Defendant says that the marijuana collected by the officers included dirt, stems and seeds, and that, if these materials were subtracted from the total, the total weight could as well have been less than 30 kilograms as more than that amount.

A similar argument was made by Orville Childress in his case, *State v. Childress*, 882 S.W.2d 691 (Mo.App.1994), and the issue was decided adversely to the defendant, after a thorough discussion. Defendant here, like Childress, was charged with manufacture and production of "a mixture or substance containing marijuana," *see* section 195.222(7), and the Childress case is controlling here. The product does not have to be pure marijuana.

■ Defendant says that, without counting certain quantities of marijuana substance which should not have been included, the marijuana substance did not amount to as much as 30 kilograms. He says that 243.31 grams found in Peach's house on September 11 should not be included in the total weight, and also that 40.94 grams identified only as "additional substances" should not have been counted.

■ We have concluded that the marijuana found in the house on September 11 was properly included in the total. The marijuana found in the house, although physically separate from the bulk of the weed which was located in the barn, and although found one day earlier than that located in the barn, still was closely enough connected therewith to justify combining the weights of the two for purposes of the trafficking statute. It was all on the same premises, and all the product of a single operation. The statute does not require that all the weed be in a single package, or at a single location, although there are no doubt reasonable limits on the time and space which could separate the component quantities. With reference to the marijuana in his house, Peach testified he was "getting it from Orville (Childress)." When asked if he had access to marijuana to smoke, he replied, "Yeah. I had a whole barn full." Apparently referring to that in his house, he testified: "... I had just got that out of the barn."

We hold, therefore, that the evidence of the weight of the marijuana was sufficient to prove it was more than 30 kilograms, and therefore within the meaning of section 195.222.7(1), even if, as defendant says, the 40.94 grams identified as "additional substances" should not have been included.

■ Defendant says there is no evidence that he was engaged in the "production or manufacture" of marijuana. "Manufacture" is defined as "the production, preparation, propagation, compounding or processing of ... a controlled substance...." Section 195.010(25). "Production" includes "the manufacture, planting, cultivation, growing, or harvesting of ... a controlled substance...." Section 195.010(35). Peach testified that defendant had assisted in finding the marijuana, in picking it, and in de-stemming it. Defendant's activities described in Peach's testimony clearly bring him within the reach of that statute, and within the allegations of the information and the instructions to the jury. The charge alleged, and the instructions submitted the hypothesis, that defendant acted alone or in concert with others. Each person acting in concert with others is responsible for the actions of such others. *State v. Nguyen*, 880 S.W.2d 627, 634 (Mo.App.W.D.1994); *State v. Jeffries*, 858 S.W.2d 821, 824 (Mo.App.E.D. 1993).

The evidence is furthermore sufficient to show the occurrence of the offense between September 10 and September 14, 1991. The officers searched the Peach barn on September 11 and found only a small amount of marijuana; when they returned on the next day, they found a large amount had been brought into the barn. Riley's personal participation in the manufacture or production of this particular batch of marijuana was not directly shown, but his participation in the ongoing operation was clear, if Peach's testimony was to be believed, and the jury could infer that defendant had acted in concert with others in the manufacture and production of this particular quantity of marijuana. *Jeffries,* 858 S.W.2d at 824.

We hold, therefore, that the evidence supported defendant's conviction of first degree trafficking in drugs under section 195.222.7(1), and that the verdict-directing instruction was supported by the evidence and was in proper form.

■ Defendant claims the court erroneously allowed proof of his post-arrest silence, disapproved in *State v. Mabie,* 770 S.W.2d 331, 334 (Mo.App.W.D.1989); *State v. Stuart,* 456 S.W.2d 19, 22 (Mo. banc 1970). He asks review of this allegation under the plain error rule, for it has not been preserved for review.

We have examined the record. Defendant's post-arrest silence came into evidence in a casual way, and the prosecutor made no attempt to make anything of it. He did not mention it in his jury argument. Significant prejudice to defendant is unlikely.

The judgment of conviction is affirmed.

All concur.